# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

AMANDA HEAD,

      Plaintiff,

                                  Case No. 24-cv-11818

v.                               Hon. Mark A. Goldsmith

OXFORD RECOVERY CENTER,

      Defendant.

| | |
|---|---|
| Noah S. Hurwitz (P74063) | J. David Garcia (P60194) |
| Colin H. Wilkin (P86243) | Salvatore J. Vitale (P75449) |
| Brendan J. Childress (P85638) | Jailah D. Emerson (P84550) |
| HURWITZ LAW PLLC | VARNUM LLP |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |
| 340 Beakes St., Suite 125 | 480 Pierce St., Suite 300 |
| Ann Arbor, MI 48104 | Birmingham, MI 48009 |
| (844) 487-9489 | (248) 567-7800 |
| noah@hurwitzlaw.com | jdgarcia@varnumlaw.com |
| colin@hurwitzlaw.com | sjvitale@varnumlaw.com |
| brendan@hurwitzlaw.com | jdemerson@varnumlaw.com |

## <u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

      Plaintiff Amanda Head ("Plaintiff"), by and through her attorneys, Hurwitz

Law PLLC, hereby moves for partial summary judgment pursuant to Fed. R. Civ. P.

56.  Plaintiff relies on the attached Brief in Support.

                                Respectfully Submitted,

                                HURWITZ LAW PLLC
                                */s/ Noah S. Hurwitz*
                                Noah S. Hurwitz (P74063)
                                *Attorneys for Plaintiff*

340 Beakes St., Suite 125
Ann Arbor, MI 48104

Dated: January 21, 2026

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

AMANDA HEAD,

      Plaintiff,

                             Case No. 24-cv-11818

v.                            Hon. Mark A. Goldsmith

OXFORD RECOVERY CENTER,

      Defendant.

| | |
|---|---|
| Noah S. Hurwitz (P74063) | J. David Garcia (P60194) |
| Colin H. Wilkin (P86243) | Salvatore J. Vitale (P75449) |
| Brendan J. Childress (P85638) | Jailah D. Emerson (P84550) |
| HURWITZ LAW PLLC | VARNUM LLP |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |
| 340 Beakes St., Suite 125 | 480 Pierce St., Suite 300 |
| Ann Arbor, MI 48104 | Birmingham, MI 48009 |
| (844) 487-9489 | (248) 567-7800 |
| noah@hurwitzlaw.com | jdgarcia@varnumlaw.com |
| colin@hurwitzlaw.com | sjvitale@varnumlaw.com |
| brendan@hurwitzlaw.com | jdemerson@varnumlaw.com |

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................. iii

**INTRODUCTION** ............................................................................. 1

**STATEMENT OF FACTS** ................................................................. 2

**STANDARD OF REVIEW** ............................................................... 11

**ARGUMENT** ...................................................................................... 12

**I.  FLSA FRAMEWORK AND EXEMPTION REQUIREMENTS** ......... 12

**II.  PLAINTIFF'S PRIMARY DUTY WAS NOT MANAGEMENT** ......... 15

**III.  PLAINTIFF DID NOT DIRECT WORK OF MULTIPLE
        EMPLOYEES** ............................................................................ 16

**IV.  PLAINTIFF LACKED AUTHORITY TO HIRE, FIRE, OR
        DISCIPLINE** ............................................................................. 18

**V.  PETERSON'S ADMISSION OF IGNORANCE IS FATAL TO
        DEFENDANT'S DEFENSE** ...................................................... 21

**VI.  NO REASONABLE JURY COULD FIND OTHERWISE** ................ 23

**CONCLUSION** ................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Beauchamp v Flex-N-Gate LLC*, 357 F Supp 2d 1010 (ED Mich, 2005) ..............14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................11

*Cook v. Carestar, Inc.*, No. 2:11-cv-00691, 2013 WL 5477148 (S.D. Ohio Sept. 16, 2013) ...................................................................................22

*Douglas v. Argo-Tech Corp.*, 113 F.3d 67 (6th Cir. 1997).............................. 12, 13

*Eberline v. Douglas J. Holdings, Inc.*, 629 F.Supp.3d 640 (E.D. Mich. 2022).......23

*Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134 (2018)...................................13

*Guy v. Absopure Water Company, LLC*, 728 F.Supp.3d 527 (E.D. Mich. 2024) ..13, 22

*McCall v First Tennessee Bank Nat Ass'n*, No. 3:13-CV-00386, 2014 WL 2159007 (MD Tenn, May 23, 2014)...................................................................16

*Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838 (6th Cir. 2019)........................13

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496 (6th Cir. 2007)....... passim

*Viviani v Coffey & Assoc, Inc*, No. CIV-22-00090-PRW, 2023 WL 3444696 (WD Okla, May 12, 2023) ............................................................................20

*Wade v Werner Trucking Co*, No. 2:10-CV-270, 2014 WL 1091707 (SD Ohio, March 18, 2014)................................................................. 12, 13, 14

**Statutes**

29 C.F.R. § 541.100(a)(2) .................................................................14

29 C.F.R. § 541.100(a)(3) ......................................................... 14, 16, 18

29 C.F.R. § 541.100(a)(4) ......................................................... 14, 18, 19

29 C.F.R. § 541.603 ................................................................. 19, 20

29 C.F.R. § 541.700(a).....................................................................14

29 U.S.C. § 202 .............................................................................12

29 U.S.C. § 207 .............................................................................12

29 U.S.C. § 207(a)(1)......................................................................12

29 U.S.C. § 213(a)(1)................................................................. 12, 13

**Rules**

Fed. R. Civ. P. 56(a).......................................................................11

iii

## <u>STATEMENT OF ISSUES PRESENTED</u>

**I.**     Whether this Court should grant summary judgment as to Plaintiff's Count III - Violation of the Fair Standards Labor Act ("FLSA") where (1) Plaintiff's primary duty was not management; (2) Plaintiff did not direct the work of multiple people; and (3) Plaintiff lacked the authority to hire, fire, or discipline employees.

**Plaintiff Answers: Yes**
**This Court Should Answer: Yes**

**INTRODUCTION**

This motion arises against a backdrop of extraordinary circumstances involving Defendant Oxford Recovery Center's owner and CEO, Tamela Peterson. On March 10, 2025, Ms. Peterson was arrested and charged with second-degree murder and involuntary manslaughter in connection with a January 31, 2025 hyperbaric chamber explosion that killed five-year-old Thomas Cooper. *Detroit Free Press*, *Judge weighs whether Oxford Center CEO, workers should face trial* (Jan. 20, 2026); *FOX 2 Detroit*, *Hyperbaric chamber explosion: Owner of Oxford Center arrested in 5-year-old boy's death* (Mar. 10, 2025). Two other Oxford employees face identical charges, and one employee is charged with falsifying medical records. *Id.* Additionally, on January 20, 2026, Ms. Peterson was arraigned on nine counts of felony healthcare fraud for billing services that were not rendered at Oxford's Brighton and Troy facilities. *FOX 2 Detroit*, *Tamela Peterson, CEO of Oxford Recovery Center charged with health care fraud* (Jan. 20, 2026). This is not the first criminal matter involving Oxford personnel. On December 3, 2024, Oxford's former director of services, Kimberly Casey Coden-Diskin, was sentenced to 4-6 years for six counts of Unauthorized Practice of a Health Profession, 4-7.5 years for two counts of Identity Theft, and 4-6 years for Bribing and Intimidating a Witness. 2025.03.11 Plaintiff's Notice of Supplemental Information, ECF No. 15, PageID.273-274.

Against this troubling backdrop, Ms. Peterson gave deposition testimony on October 29, 2025 that irrefutably establishes Defendant's liability for violations of the Fair Labor Standards Act ("FLSA"). Ms. Peterson admitted under oath that Plaintiff was not a manager, had no direct reports, possessed no authority to discipline employees, and that Peterson herself did not understand what it means for an employee to be exempt from overtime. These admissions, combined with the undisputed facts, prove that Plaintiff was improperly classified as exempt, was denied overtime pay despite routinely working 50 hours per week, and was performing non-managerial duties. No reasonable jury could find otherwise.

It is notable that Defendant has failed to even attempt to defend this matter, having not taken Plaintiff's deposition and sat idle during the entire discovery period. Any trial in this matter should be streamlined, which is why Plaintiff moves for partial summary judgment on liability as to Count III of her Complaint (FLSA violations). The sole remaining question, the calculation of overtime damages owed to Plaintiff, is properly reserved for the jury's determination at trial.

## **STATEMENT OF FACTS**

1.     Plaintiff began working for Defendant on October 31, 2022 in the position of Revenue Cycle Manager. **Ex. 1, Deposition of Tami Peterson** at 9:17-18; **Ex. 2, Declaration of Amanda Head, ¶**3.

2.      Plaintiff was hired at an annual salary of $70,000.00.  This equates to a regular hourly rate of $33.65 per hour and an overtime rate of $50.48 per hour.  *Id.* at ¶4.

3.      Plaintiff was classified as an exempt, salaried employee by Defendant. Ex. 1, Dep of Tami Peterson, 10:9-10.  ("She was an exempt employee, hence why she worked so many weeks way under forty.  She was salary.")

4.      Defendant's CEO Tami Peterson testified that she did not personally participate in Plaintiff's hiring or the decision to classify Plaintiff as exempt.  *Id.* at 41:1-4. ("I didn't take part in all of the interviews, so she probably negotiated it.  So we probably had a conversation with HR.  I don't remember the details.").

5.      The decision to classify Plaintiff as exempt from overtime was made by HR Director Jamie Johnson.  *Id.* at 41:6-15.

6.      Plaintiff's official job title was "Revenue Cycle Manager," but Peterson testified Plaintiff's role involved "leadership" rather than "management."  *Id.* at 10:2-3.  (Q: "Was it a management role?" A: "There was leadership.  I would not say management.").

7.      Plaintiff's primary duty was "working under the biller to assist with accounts receivable."  *Id.* at 10:1.

8.      More specifically, Plaintiff was to "work with the lead biller on getting accounts that were not getting paid, paid, through -- it's primarily through health insurance accounts." *Id.* at 10:14-16.

9.      Ms. Peterson testified that Plaintiff reported to Jordan Miller, the lead biller, who would guide Plaintiff "with what account she needed to go and how to call the insurance company." *Id.* at 10:18-19; 22-23.

10.     Jordan Miller reported to Blake Oxford, who held the title of "Special Project" and was on the "Director's roll." *Id.* at 11:1-6.

11.     Blake Oxford reported directly to CEO Tami Peterson. *Id.* at 11:7-8.

12.     Peterson acknowledged there were "like three people between me and her role," referring to the layers of management between herself and Plaintiff. *Id.* at 10:13-14.

13.     As a salaried employee Plaintiff's expected work schedule was 45 hours per week, five days per week. **Ex. 3, ORC Handbook 2022,** page 5.

14.     However, Plaintiff routinely worked approximately 50 hours per week without receiving overtime compensation. Ex. 2, Declaration of Amanda Head, ¶5.

15.     Plaintiff was required to arrive at least a half hour before her scheduled shift to prepare for work. *Id.* at ¶6.

16.     Plaintiff also worked outside of regularly scheduled shifts, including attending required evening meetings and working on weekends. *Id.* at ¶7.

4

17.   Peterson confirmed that "caregiver training meetings[]" "were to be done after work." "They were not to be done during work." Ex. 1, Peterson Dep. 15:22-24.

18.   Despite being classified as exempt, Defendant repeatedly docked Plaintiff's pay when she left early to take her son to medical appointments.  Ex. 2, Declaration of Amanda Head, ¶8.

19.   Plaintiff's son was a patient receiving autism treatment at Defendant's facility, and Defendant required parents to attend meetings as part of the treatment program to bill for "parent training."  *Id.* at ¶¶9-10.

20.   Plaintiff was also denied holiday pay for holidays that fell on Sundays, including Christmas, New Year's Day, and Easter.  *Id.* at ¶11.

21.   Specifically, when Christmas and New Year's Day fell on Sunday in the 2022-2023 holiday season, Defendant failed to either compensate Plaintiff for these holidays or give her the option of taking the following Mondays off work.  *Id.* at ¶12.

22.   Defendant's employee handbook stated that salaried employees who planned to leave early from a shift "must also notify Human Resources and their manager."  Ex. 3, ORC Handbook 2022, page 6.

23.   The handbook also provided that "[o]vertime is permitted only upon approval from a manager" and that "[e]xempt employees are expected to stay when required."  *Id.* at 7.

24.   Plaintiff's time records show she clocked in and out each day, with specific start and end times recorded.  ECF No. 13-2, PageID.225-229.

25.   For example, Plaintiff's time records show she worked 41.61 hours during her second full week of employment.  *Id.* at PageID.221, ¶4.

26.   During her employment from October 31, 2022 to July 27, 2023, Plaintiff worked 133 days total.  *Id.* ¶ 5.

27.   On April 4, 2023, Peterson told Plaintiff she was "pulling" Plaintiff's position as it was "no longer needed" and moving her to another team where she would act as an "assistant to the Clinical Director."  Ex. 2, Declaration of Amanda Head, ¶13.

28.   This demotion occurred the day after Plaintiff returned from vacation and one day after Plaintiff refused to participate in allegedly unlawful conduct requested by former employee Kimberly "Casey" Coden-Diskin.  *Id.* at ¶14.

29.   After the demotion, Plaintiff sought medical treatment and her physician recommended short-term disability leave due to stress and anxiety.  *Id.* at ¶15.

30.    When Plaintiff informed Peterson of her need to take medical leave, Peterson responded by allowing the leave but informing Plaintiff that she "would not have a position when she returned." *Id.* at ¶16.

*31.*    Plaintiff was instructed to gather all of her belongings and begin her leave. *Id.* at ¶17.

32.    On July 27, 2023, Plaintiff received a notice of termination, indicating that all benefits would end on July 31, 2023. *Id.* at ¶18.

33.    Peterson testified that Plaintiff was not formally terminated but rather "just kind of didn't come back" from her medical leave. Ex. 1, Peterson Dep., 40:7.

34.    Peterson testified that she was not aware of any formal notice of termination being served or delivered to Plaintiff. *Id.* at 40:2-4.

35.    At the time of her termination, Plaintiff had been employed by Defendant for approximately nine months, from October 31, 2022 to July 27, 2023. Ex. 2, Declaration of Amanda Head, ¶19.

**Peterson's Admissions and Lack of Managerial Authority**

35.    CEO Tami Peterson testified that there were "like three people between me and her role" and acknowledged that Plaintiff was positioned several layers below her in the organizational hierarchy. Ex. 1, Peterson Dep., 10:13-14.

36.     When asked whether Plaintiff's role was a "management role," Peterson responded: "There was leadership. I would not say management." *Id.* at 10:2-3.

37.     Peterson elaborated on this distinction, stating: "I don't know if I would call it management. Because everything managing is you have people underneath you. I think she worked as part of the team, more in a leadership." *Id.* at 15:11-13.

38.     Peterson confirmed that Plaintiff had no direct reports and did not supervise any employees. *Id.* at 15:14-17.

39.     Instead, Peterson testified that Jordan Miller, the lead biller, was responsible for supervising and guiding Plaintiff's work. *Id.* at 10:18-19; 22-24.

40.     Peterson described Plaintiff's primary duties as "working with the lead biller on getting accounts that were not getting paid, paid, through -- it's primarily through health insurance accounts." *Id.* at 10:14-16.

41.     When asked whether Plaintiff had "discretion or authority to discipline any employees," Peterson unequivocally answered: "No." *Id.* at 31:13-15.

42.     Similarly, when asked whether Plaintiff had "the discretion or authority to make decisions about employees without input from management," Peterson again answered: "No." *Id.* at 31:16-18.

43.     Peterson   acknowledged   that   decisions   regarding   employee classification as exempt or non-exempt were made by HR Director Jamie Johnson, not by Peterson herself.  *Id.* at 41:6-15.

44.     Peterson admitted she did not participate in Plaintiff's hiring process or the decision to classify Plaintiff as exempt from overtime.  *Id.* at 41:1-4.

45.     When asked "What does it mean for an employee to be exempt to the best of your knowledge?" Peterson responded: "I don't know."  *Id.* at 42:6-7; 10.

46.     Peterson further elaborated: "I think exempt are salary, non-exempt are not. I am not a HR Director. That is why you have a HR Director so they follow all the rules, I don't know."  *Id.* at 42:15-17.

47.     Despite being the CEO of the company that classified Plaintiff as exempt, Peterson admitted she did not understand the legal requirements for exempt status.  *Id.* at 42:6-7; 10.

48.     Peterson could not identify any basis for classifying Plaintiff as exempt beyond the fact that Plaintiff received a salary rather than hourly wages.  *Id.* at 40:18-41:15.

49.     Peterson testified that the decision to classify Plaintiff as salaried was "just a determination when she was hired that it would be a salaried position," without any analysis of whether the position qualified for the executive exemption. *Id.* at 40:18-19.

9

50.    When asked who made the decision to make Plaintiff a salaried employee, Peterson stated: "She probably negotiated it. I don't even remember to be honest." *Id.* at 40:22-23.

51.    Peterson acknowledged that Plaintiff maintained regular timecards tracking her hours worked, with specific clock-in and clock-out times recorded. ECF No. 13-2, PageID.221, ¶4.

52.    Peterson claims that Plaintiff's highest recorded week of work was 41.61 hours during her second full week of employment. *Id.*

53.    However, Peterson's testimony contradicted Plaintiff's contemporaneous reports and the nature of Plaintiff's actual job duties, which required her to arrive at least 30 minutes before her scheduled shift and attend required evening meetings. Ex. 2, Declaration of Amanda Head, ¶¶5-7.

54.    Despite Plaintiff being classified as exempt, Defendant docked Plaintiff's salary when she had to leave early for personal reasons. *Id.* at ¶8.

55.    Specifically, Plaintiff was docked pay any time she had to leave early to take her son to medical appointments, or attend their required parent meetings. *Id.*

56.    Peterson testified that Plaintiff never had authority to hire employees, interview job applicants, or make final hiring decisions. Ex. 1, Peterson Dep., 31:13-18.

57.     Peterson confirmed that all hiring decisions were made by management personnel above Plaintiff's level, specifically Blake Oxford and Peterson herself. *Id.* at 11:6-16.

58.     Peterson acknowledged that Plaintiff had no involvement in setting company policies, determining employee compensation, or making strategic business decisions. *Id.* at 10:2-3; 31:13-18.

59.     Peterson testified that she personally made the decision to remove Plaintiff from her Revenue Cycle Manager position and move her to an assistant role. *Id.* at 39:8-10.

60.     Peterson's testimony establishes that Plaintiff worked under the direction and supervision of Jordan Miller, who in turn reported to Blake Oxford, who reported to Peterson herself, a clear hierarchical structure inconsistent with managerial status. *Id.* at 10:13-24; 11:1-8.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In the FLSA context, the employer bears the

11

burden of proving that each alleged exemption applies to each employee in question. *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997). "Because establishing the applicability of an FLSA exemption is an affirmative defense, [the defendant] has the burden to establish the . . . elements by a preponderance of the evidence." *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 502 (6th Cir. 2007).

## ARGUMENT

## I.  FLSA FRAMEWORK AND EXEMPTION REQUIREMENTS

The Fair Labor Standards Act requires employers to pay employees overtime at a rate not less than one and one-half times their regular rate of pay for all hours worked over forty (40) hours per week. 29 U.S.C. § 207(a)(1). The FLSA was enacted in 1938 to address "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers. *Wade v Werner Trucking Co*, No. 2:10-CV-270, 2014 WL 1091707, at *12 (SD Ohio, March 18, 2014) (citing 29 U.S.C. § 202). Congress achieved this goal by "penaliz[ing] employers who scheduled employees for long hours (and concomitantly rewarding the employees who worked them) by requiring 'time and a half pay for overtime hours.'" *Id.* (quoting 29 U.S.C. § 207).

However, Congress carved out exemptions from this requirement for certain categories of employees, including those "employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1). These exemptions are affirmative defenses, and

the employer "bears the burden of proving that [each alleged] exemption applies to [each] employee in question." *Wade v Werner Trucking Co*, No. 2:10-CV-270, 2014 WL 1091707, at *13 (SD Ohio, March 18, 2014) (citing *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997)). The Sixth Circuit has "made it clear that the employer claiming an FLSA exemption does not bear any heightened evidentiary burden," but "because establishing the applicability of an FLSA exemption is an affirmative defense, [the defendant] has the burden to establish the . . . elements by a preponderance of the evidence." *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501-02 (6th Cir. 2007).

Moreover, FLSA exemptions must be given a "fair, rather than a narrow, reading." *Guy v. Absopure Water Company, LLC*, 728 F.Supp.3d 527, 532 (E.D. Mich. 2024) (citing *Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 850 (6th Cir. 2019); *Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142 (2018)). Nevertheless, exemptions are to be construed against employers seeking to assert them, and the employer "must establish through 'clear and affirmative evidence' that the employee meets every requirement of an exemption." *Thomas*, 506 F.3d at 501.

For an employee to qualify for the bona fide executive exemption under 29 U.S.C. § 213(a)(1), the employer must prove three essential elements. First, the employee's "primary duty" must be "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision

thereof." 29 C.F.R. § 541.100(a)(2).  Second, the employee must "customarily and regularly direct[] the work of two or more other employees."   29 C.F.R. § 541.100(a)(3).  Third, the employee must have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100(a)(4).  All three requirements must be satisfied for the exemption to apply.  *Wade v Werner Trucking Co*, No. 2:10-CV-270, 2014 WL 1091707, at *13 (SD Ohio, March 18, 2014).

The term "primary duty" means "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).  The phrase management of the enterprise includes "activities typically associated with management or supervision, such as hiring and firing, apportioning and directing the work of subordinates, evaluating performance, and handling employee complaints and discipline." *Beauchamp v Flex-N-Gate LLC*, 357 F Supp 2d 1010, 1018 (ED Mich, 2005).  Courts cannot rely solely on "the plaintiff's or the employer's description" of the plaintiff's duties, but must instead "look at the plaintiff's actual duties to determine whether she qualifies for the executive exemption." *Thomas*, 506 F.3d at 503.

14

In this case, Defendant's own admissions establish that Plaintiff fails to satisfy any of the three requirements for the executive exemption.  As demonstrated below, no reasonable jury could conclude otherwise.

## II.  PLAINTIFF'S PRIMARY DUTY WAS NOT MANAGEMENT

Plaintiff's main duties did not consist of the "management of the enterprise." Peterson testified that Plaintiff's primary duty was "working with the lead biller on getting accounts that were not getting paid, paid" through insurance billing and collections.  Ex. 1, Peterson Dep. 10:14-16.  This is unequivocally a non-managerial revenue cycle function, not management.  When asked whether Plaintiff's role was a "management role," Peterson responded: "There was leadership.  I would not say management."  *Id.* at 10:2-3.  She elaborated: "I don't know if I would call it management.  Because everything managing is you have people underneath you.  I think she worked as part of the team, more in a leadership."  *Id.* at 15:11-13.

The record is clear, and Defendant has no evidence to contradict, that Plaintiff was never performing primarily managerial job duties.  She never handled employee complaints or conducted workplace investigations.  She never interviewed job applicants.  She never set employee compensation or established company policies. And Defendant has already admitted that Plaintiff had no "discretion or authority to discipline any employees."  *Id.* at 31:13-15.

Jordan Miller, Plaintiff's supervisor, controlled all of Plaintiff's work duties, guiding her "with what account she needed to go and how to call the insurance company." *Id.* at 10:18-19; 22-23. Plaintiff had no direct reports and supervised no one. *Id.* at 15:14-17. With three layers of management between Plaintiff and the CEO, Plaintiff possessed no managerial authority whatsoever. Accordingly, there is no evidence in the record from which a jury can find that Plaintiff's primary duty was management of the enterprise.

## III.   PLAINTIFF DID NOT DIRECT WORK OF MULTIPLE EMPLOYEES

The second prong of the executive exemption requires that the employee "customarily and regularly directs the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course may be less than constant." *McCall v First Tennessee Bank Nat Ass'n*, No. 3:13-CV-00386, 2014 WL 2159007, at *9 (MD Tenn, May 23, 2014). An employee will not meet this requirement if she "merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence." *Id.*

Peterson's testimony establishes that Plaintiff directed no one's work. When asked whether Plaintiff had any direct reports, Peterson unequivocally answered: "Not that I'm aware. I would have said the supervision came under Jordan." Ex. 1,

Peterson Dep. 15:11-17.  This admission is fatal to Defendant's defense.  Plaintiff had zero direct reports, and "supervision came under Jordan," not Plaintiff.  *Id.*

Peterson further admitted that Plaintiff was not in the management chain at all.  She testified "I don't know if I would call it management. Because everything managing is you have people underneath you." *Id.* at 15:11-12.  Peterson also testified there were "three people between me and her role," establishing multiple layers of management above Plaintiff.  *Id.* at 10:13-14.  Those three people were: (1) Jordan Miller, the lead biller who directly supervised Plaintiff; (2) Blake Oxford, who held a Director-level position; and (3) Peterson herself as CEO.  *Id.* at 10:13-24; 11:1-8.  An employee who has three levels of management above her cannot possibly be directing the work of two or more employees below her.

Moreover, Plaintiff herself was supervised, she did not supervise others.  Jordan Miller would be the one guiding her "with what account she needed to go and how to call the insurance company."  *Id.* at 10:18-19; 22-23.  The operational reporting structure confirms Plaintiff was a subordinate, not a supervisor.  When Peterson was asked whether Plaintiff's role was a "management role," she responded: "There was leadership.  I would not say management." *Id.* at 10:2-3.  Peterson elaborated: "I don't know if I would call it management.  Because everything managing is you have people underneath you.  I think she worked as part

17

of the team, more in a leadership." *Id.* at 15:11-13.  This admission confirms Plaintiff had no one "underneath" her to supervise or direct.

Defendant never trained Plaintiff to supervise employees, never assigned employees to report to her, and never gave her authority to direct anyone's work. The element of "customarily and regularly" directing two or more employees requires consistent, ongoing supervisory responsibility,  not occasional coordination or teamwork.  29 C.F.R. § 541.100(a)(3).  Plaintiff had none.

This element is dispositive.  Without supervising two or more employees, the exemption categorically does not apply.  No reasonable jury could find that Plaintiff directed the work of two or more employees when Defendant's own CEO testified Plaintiff had no direct reports and that "supervision came under Jordan."  *Id.* at 10:18-19; 22-24.

## IV. PLAINTIFF LACKED AUTHORITY TO HIRE, FIRE, OR DISCIPLINE

The third prong of the executive exemption requires that the employee have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100(a)(4).  This element demands genuine authority over personnel decisions, not merely the ability to make suggestions.  Peterson's testimony establishes Plaintiff possessed no such authority.

18

When asked whether Plaintiff had "discretion or authority to discipline any employees," Peterson unequivocally answered: "No."  Ex. 1, Peterson Dep. 31:13-15.  This admission alone is dispositive on this element.  Similarly, when asked whether Plaintiff had "the discretion or authority to make decisions about employees without input from management," Peterson again answered: "No."  *Id.* at 31:16-18.  These admissions confirm Plaintiff had zero authority over personnel matters.

The record contains no evidence that Plaintiff hired or fired any employee during her nine-month tenure.  Plaintiff never interviewed job applicants, never made final hiring decisions, and never terminated anyone.  She had no direct reports to supervise, much less to hire or fire.  Nor is there any evidence that Plaintiff's recommendations regarding personnel decisions were "given particular weight."  29 C.F.R. § 541.100(a)(4).  Plaintiff made no such recommendations because she had no involvement in personnel matters whatsoever.

Moreover, Defendant itself did not treat Plaintiff as exempt.  Despite classifying Plaintiff as a salaried, exempt employee, Defendant repeatedly docked Plaintiff's salary for partial-day absences.  Ex. 2, Declaration of Amanda Head, ¶8.  Federal regulations provide that improper deductions from an exempt employee's salary cause the employer to lose the exemption.  29 C.F.R. § 541.603.  By docking Plaintiff's pay whenever she was required to leave early in order to attend medical appointments for her son, Defendant forfeited any claim to exempt status. Ex. 2,

19

Declaration of Amanda Head, ¶8. This conduct demonstrates Defendant itself did not truly believe Plaintiff was exempt under the FLSA.

The regulations make clear that the exemption requires actual authority, not nominal titles. An employee must have genuine power to affect personnel decisions or make recommendations that are regularly and substantially followed. Here, Plaintiff possessed neither. She held no authority to discipline, had no involvement in hiring or firing, and made no recommendations regarding personnel matters that management considered, much less followed.

The improper salary deductions provide further evidence that Defendant itself did not believe Plaintiff qualified as exempt. Under 29 C.F.R. § 541.603, an employer forfeits the executive exemption when it makes improper deductions from an employee's salary. The FLSA prohibits docking an exempt employee's salary for partial-day absences. Yet Defendant repeatedly violated this rule, docking Plaintiff's pay whenever she left early for medical appointments with her son. Ex. 2, Declaration of Amanda Head, ¶9. This pattern of deductions shows Defendant treated Plaintiff as a non-exempt, hourly employee, not as the exempt manager it now claims she was. An employer is "stripped of the exemption because its 'actual practice' of improperly deducting pay vitiates the intent to pay a salary under the salary-basis test." *Viviani v Coffey & Assoc, Inc*, No. CIV-22-00090-PRW, 2023 WL 3444696, at *4 (WD Okla, May 12, 2023).

Peterson's admission of "No" authority to discipline is fatal to Defendant's defense.  Combined with the absence of any hiring or firing authority, the lack of recommendations given particular weight, and Defendant's own conduct in treating Plaintiff as non-exempt through improper salary deductions, no reasonable jury could find Plaintiff satisfied the third prong of the executive exemption.

## V.   PETERSON'S ADMISSION OF IGNORANCE IS FATAL TO DEFENDANT'S DEFENSE

Peterson's stunning admission that she does not understand what it means for an employee to be exempt is fatal to Defendant's defense.  When asked "What does it mean for an employee to be exempt to the best of your knowledge?" Peterson responded: "I don't know."  Ex. 1, Peterson Dep. 42:6-7; 10.  She elaborated: "I think exempt are salary, non-exempt are not.  I am not a HR Director.  That is why you have a HR Director so they follow all the rules, I don't know." *Id.* at 42:15-17.  This admission proves Defendant never properly analyzed whether Plaintiff met the exemption requirements before classifying her as exempt.

As CEO and owner, Peterson was ultimately responsible for ensuring compliance with the FLSA's requirements, including proper employee classification.  Yet she admits she has no understanding of the legal standard for exemption beyond the erroneous belief that paying someone a salary automatically makes them exempt. *Id.* at 42:15-17.  This is precisely the type of willful ignorance that courts have found demonstrates reckless disregard for FLSA requirements.  See

*Guy v. Absopure Water Co., LLC*, 2024 WL 1344240, at *2 (E.D. Mich. 2024) (finding employer's failure to make any inquiry into whether its conduct violated FLSA supported jury's finding of willfulness); *Cook v. Carestar, Inc.*, No. 2:11-cv-00691, 2013 WL 5477148, at *13 (S.D. Ohio Sept. 16, 2013) (employer's misclassification amounts to willful conduct where "employer deliberately chose to avoid researching the laws' terms").

Defendant cannot carry the burden of proving the exemption applies when its CEO admits she doesn't understand the exemption requirements. The FLSA places the burden on employers to prove "through clear and affirmative evidence that the employee meets every requirement of an exemption." *Thomas,* 506 F.3d at 501.. Defendant cannot meet this burden when Peterson admits she doesn't know what "exempt" means. Ex. 1, Peterson Dep. 42:6-7; 10.

Peterson's ignorance of the law does not excuse the violation, it confirms it. An employer who classifies employees as exempt without understanding the legal requirements acts with reckless disregard for the FLSA. *Guy*, 2024 WL 1344240, at *2. This is precisely why Congress placed the burden on employers and required clear and affirmative evidence. When the person making classification decisions admits she doesn't understand the law she's applying, the exemption fails as a matter of law. No reasonable jury could find otherwise.

## VI.   NO REASONABLE JURY COULD FIND OTHERWISE

This is precisely the type of case where summary judgment is appropriate. Peterson has admitted every fact that proves the exemption does not apply: Plaintiff had no direct reports, possessed no authority to discipline employees, performed billing and collections work rather than management, and reported to Jordan Miller who directed her work.  Ex. 1, Peterson Dep. 10:1; 10:14-16; 10:18-19; 10:22-23. Most significantly, Peterson admitted she didn't know what it means for an employee to be exempt.  *Id.* at 42:6-7; 10.  When an employer cannot articulate any legal basis for classifying an employee as exempt and admits the employee possessed none of the hallmarks of executive status, "no reasonable jury could find otherwise."  *Eberline v. Douglas J. Holdings, Inc.*, 629 F.Supp.3d 640, 655 (E.D. Mich. 2022).  Defendant bears the burden of proving exemption applies and they simply have no evidence to meet it.  Liability is established as a matter of law.

Defendant cannot overcome these admissions by pointing to Plaintiff's job title or general billing duties.  Job titles alone cannot establish exempt status, and performing general business functions is insufficient—the regulations require actual managerial authority over subordinates.  *Thomas*, 506 F.3d at 503 (courts must "look at the plaintiff's actual duties").

## **CONCLUSION**

Based on the undisputed evidence and Defendant's admissions, no reasonable jury could find that Plaintiff was properly classified as exempt from overtime. Defendant failed to track Plaintiff's hours and owes her overtime pay for all hours worked over 40 per week.  The only remaining question is the calculation of damages.  This Court should grant partial summary judgment finding Defendant liable for FLSA violations and schedule a jury trial to determine damages only.

Respectfully Submitted,

HURWITZ LAW PLLC
*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
*Attorneys for Plaintiff*
340 Beakes St., Suite 125
Ann Arbor, MI 48104
(844) 487-9489

Dated: January 21, 2026

## **<u>PROOF OF SERVICE</u>**

The undersigned certifies that a copy of the foregoing was served upon the

attorney(s) of record for all parties by submitting the document through the ECF

filing system on January 21, 2026:

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)